IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JOSE ECHEVARRIA, | CASE NO. 3:25-CV-00825-CEH |
| Plaintiff, | JUDGE CARMEN E. HENDERSON |
| | UNITED STATES MAGISTRATE JUDGE |
| v. | |
| | MEMORANDUM OPINION AND ORDER |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant, | |

**I. Introduction**

Jose Echevarria ("Echevarria" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying his applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). This matter is before me by consent of the parties under 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (ECF No. 9). For the reasons set forth below, the Court AFFIRMS the Commissioner of Social Security's final decision denying Echevarria benefits.

**II. Procedural History**

On February 21, 2023, Echevarria filed applications for DIB and SSI, alleging a disability onset date of November 1, 2022. (ECF No. 8, PageID #: 75). The applications were denied initially and upon reconsideration, and Echevarria requested a hearing before an administrative law judge ("ALJ"). (*Id.*). On April 23, 2024, an ALJ held a hearing, during which Claimant, represented by counsel, and an impartial vocational expert testified. (*See id.* at PageID #: 102-35). On May 28, 2024, the ALJ issued a written decision finding Echevarria was not disabled.

1

(*Id.* at PageID #: 75-88). The ALJ's decision became final on February 27, 2025, when the Appeals Council declined further review. (*Id.* at PageID #: 65-68).

On April 24, 2025, Echevarria filed his Complaint to challenge the Commissioner's final decision. (ECF No. 1). The parties have completed briefing in this case. (ECF Nos. 10, 12, 13).[1] Echevarria asserts the following assignments of error:

> (1) Despite purporting to find an RFC more restrictive than the state agency review opinions, the ALJ ignored various of their limitations and did not incorporate them, without explanation.
>
> (2) The ALJ did not properly evaluate FNP Napierala's opinion for supportability.

(ECF No. 10 at 1).

## III. Background

### A. Relevant Hearing Testimony

The ALJ summarized the relevant testimony from Echevarria's hearing:

> The claimant, a 44-year-old, alleged disability due to major depression, bipolar disorder, schizophrenia, hepatitis C, and disc in lower back (2E). In the function report, he stated that it was very difficult to focus and concentrate, he has anger issues, and his back was deteriorating due to arthritis (4E/1). At the hearing, the claimant testified that he was unable to work due to PTSD, suicidal thoughts, daily racing thoughts, audio hallucinations, and inability to deal with grief. He takes medication but stated that he cannot function on them. He identified panic attacks as side effects to medication he is prescribed, and these happen about four times per day without known triggers. The claimant stated that he has trouble getting along with others because he does not have patience for people who are disrespectful, and that he loses control of his temper at times. He testified that he gets very little sleep, anywhere from two to five hours total. He hears voices daily when he has racing thoughts. The claimant explained that hospitalizations this

---

[1] Claimant's reply indicates that "[u]pon review of Defendant's responsive brief, Plaintiff deems no reply necessary because any reply would simply duplicate arguments made in the original brief, and accordingly relies on the original arguments and authority contained in Plaintiff's primary brief." (ECF No. 13 at 1). Accordingly, Plaintiff's reply will not be discussed further.

> year for suicidal ideations was from depression after his wife was killed and the other was mood swings from bipolar disorder. He testified that he can do his own personal care but struggles with motivation, he can do regular household chores, laundry at the laundromat with his mother, and go grocery shopping.

(ECF No. 8, PageID #: 80-81).

### B. Relevant Medical Evidence

The ALJ also summarized Echevarria's health records and symptoms:

> The medical evidence supported that the claimant went to an emergency department (ED) in October 2022 reporting sharp, intermittent lower back pain for the past two days that radiated down the right lower extremity (3F/32). He denied motor weakness of the extremities. (Id.). A CT of the lumbar spine found mild degenerative changes of the lumbar spine with no acute abnormality (3F/64-66). Physical examination showed moderate tenderness to palpation of spinous processes of L2-L5; tenderness and increased muscle tonus of bilateral lumbar paravertebral musculature, right greater than left; guarded range of motion of lumbar spine due to pain; and straight leg raising to 30 degrees on right evoked low back pain (3F/33). There was no muscle weakness in either lower extremity, range of motion of all major joints was normal, sensation was normal, and motor function was normal. The claimant had normal mood, affect, and judgment (Id.). The claimant ambulated with a steady gait (3F/34). He was provided pain medication and discharged (Id.).
>
> In December 2022, the claimant returned to an ED with suicidal thoughts with plan (3F/26). Mood was anxious and affect was angry (3F/28). He was pink-slipped to a mental health facility for admission (3F/30-31). The intake assessment stated the claimant was adamant about not wanting to take medication because he did not like the way they made him feel, but after discussion, he was open to try them again (4F/16-17). He was paranoid and making delusional statements. He endorsed current use of marijuana. During the hospitalization, the claimant was started on Zyprexa with improvement in symptoms, and he attended group therapy that he described as helpful. The claimant was social with peers, and by the time of discharge, he rated both anxiety and depression as a one out of 10. He did not exhibit any hallucinations or delusions and had no behavior concerning for mania. The claimant said he was planning on going to Florida to stay with his fiancé after discharge (Id.). He was provided information to utilize

resources and was advised he need continued outpatient treatment of medication and therapy to maintain stability (4F/17-18). The mental status at discharge found he had normal memory, intact concentration, goal-directed thought process, fair judgment and insight, no abnormal thoughts, self-described okay mood, and reactive affect (4F/19).

The claimant returned to an ED in January 2023 after punching himself in the head several times after an argument with his sister (3F/21-22). He had normal mood and attention, and behavior was cooperative (3F/23). A head CT was unremarkable (3F/24). He was advised to take Motrin or Tylenol and was discharged (Id.). The claimant established treatment with a primary care physician in February 2023 after he was in a motor vehicle accident several days before for which he had ongoing neck pain (3F/13). He also reported panic attacks for the past month that he was not sure what triggered them, but they mostly occurred at night. He said he had an appointment the next day with his mental health provider (Id.). Range of motion of the neck was normal but there was right posterior neck tenderness (3F/14). He had normal mood, affect, and behavior (3F/14-15). Blood tests were ordered, he was advised to go to his psychiatry appointment that was previously scheduled for the following day, and to use heat and ice on the neck (3F/15).

At that February 2023 psychiatric nurse practitioner follow up, the claimant said he was having problems with his current medications including increased anxiety with panic attacks, fatigue, and trouble with sleep (2F/1). He had no suicidal ideations and no hallucinations. He said he stopped all medications three days ago and had no more panic attacks (Id.). The claimant had normal appearance, anxious mood, constricted affect, distracted attention, guarded thoughts, guarded behavior, and impaired insight and judgment (2F/3). It appeared his medications were changed at that appointment since the return visit in March 2023 stated he felt much better after the medication change (2F/4). He said he was "getting normal," he had no panic attack issues, he denied suicidal ideations and hallucinations, and he had no other complaints or concerns (Id.). The mental status exam improved as the claimant had euthymic mood, normal concentration, cooperative behavior, logical thoughts, appropriate eye contact, intact fund of knowledge, and intact social and emotional reciprocity (2F/6). His medications were continued without change (2F/7).

A March 2023 primary care follow up stated the claimant had his medication changed by his mental health provider and felt much better (3F/10). His aches and pains from the car accident were

4

gone (3F/11). The claimant's review of systems and examination were negative/normal (3F/11-12). He was described as stable (Id.). He was evaluated by a psychiatrist in April 2023 where he reported panic attacks when taking medication but once he stops medication, the panic attacks go away (3F/7). The claimant had appropriate mood and affect, good attention and concentration, normal memory, fair judgment and insight, no abnormal thought processes, good behavior, good fund of knowledge, no suicidal ideations, no risk of harm to self or others, no loose associations, no delusions, and no hallucinations (3F/8). No medications were prescribed, but therapy was recommended (3F/10).

The claimant reported to his primary care physician in October 2023 that he was having bad back pain on some days (6F/71-72). No musculoskeletal exam was recorded. The claimant had normal mood and affect, and psychiatric/behavioral issues in review of systems were negative. He was given Flexeril and told to apply heat and do stretches (Id.). In November 2023, the claimant established treatment at a different mental health clinic (5F/1-16). He said that medication prescribed by the previous mental health clinic caused panic attacks, so he was uncertain about taking medication now, but he wanted to feel better and was willing to try again (5F/1). He was having problems getting and staying asleep (5F/4). He used marijuana to self-medicate (5F/5). The claimant's mental status exam found him cooperative/pleasant, he had good hygiene, and good eye contact (5F/3). His mood was anxious with flat affect. Thought process was logical. He reported no suicidal ideations, hallucinations, or delusions. Judgment and insight were good, intelligence was estimated as average, and memory and recall were intact (Id.). Medication management and individual therapy were both recommended (5F/9).

In January 2024, the claimant said his back pain was acting up more and Flexeril did not help (6F/68). Examination stated he had normal range of motion, normal mood, and normal behavior (6F/69). Review of systems for psychiatric/behavioral issues were negative (6F/68). He was provided a steroid injection and was told to wear his wallet in his front pocket (6F/70).

At the direction of his mental health, the claimant returned to an ED in February 2024 with suicidal ideations that were worsening after his girlfriend passed away the previous month (5F/17; 6F/36-44). The psychiatric nurse practitioner stated the claimant was alert and oriented, made good eye contact, had normal speech, his mood and affect were depressed and congruent, and he was cooperative with the assessment (6F/44). He reported being overwhelmed with

5

> emotions, having racing thoughts, and sleeping very little. He denied paranoia, hallucinations, and homicidal ideations. The claimant agreed to voluntary inpatient admission (Id.). He was hospitalized for about four days where changes were made to his medication, and he tolerated those changes without any problems or side effects (4F/1-2). He attended group therapy, felt better gradually, and was able to develop some coping skills to handle stress better. The claimant's sleep and appetite were normal during his stay, and he interacted with staff and peers without issue (Id.). The mental status exam at discharge stated he had euthymic mood, normal affect, good judgment and insight, normal thought process, cooperative attitude, and no abnormal thought content (4F/2).
>
> When he returned to his outpatient mental health provider on February 13, 2024, he stated that he was only sleeping for two hours, he was eating a lot because of anxiety, he had pressured speech, thought process was circumstantial, and he denied suicidal ideations and hallucinations (5F/27). The claimant was sad and anxious with blunted/flat affect (5F/30). Memory, attention, and concentration were within normal limits (5F/30-31). The claimant's dose of Vraylar was increased, Ativan was given for seven nights, and they continued Lexapro and trazodone (5F/34).
>
> The claimant returned to an ED in March 2024 with continued suicidal ideations with plan since his girlfriend was killed two months ago (6F/1). He also explained that he had exacerbations in his symptoms due to financial and other stressors (6F/10-11). He had a history of audio/visual hallucinations, but he denied current hallucinations. A psychiatric nurse practitioner recommended inpatient admission (Id.). While hospitalized, the claimant said that he was compliant with medication for which he felt helped, but once he received recent bad news regarding finances, he had suicidal thoughts and felt very depressed (7F/17). The claimant denied side effects to those medications, and he denied hallucinations (Id.). He attributed increased anxiety due to psychosocial stressors (7F/18). His dose of Lexapro was increased. Prior to discharge, he had positive, euthymic mood, normal affect, fair judgment and insight, attitude was cooperative, and thought process was normal (Id.).

(ECF No. 8, PageID #: 81-83).

### C. Opinion Evidence at Issue

The ALJ considered opinions from the State agency medical consultants, which he found

6

somewhat persuasive as to Plaintiff's mental abilities. (*See* ECF No. 8, PageID #: 84). The ALJ also considered a treating source statement from Nurse Practitioner Angela Napierala, which the ALJ found not persuasive. (*Id.* at PageID #: 84-85). The content of these opinions and the ALJ's consideration of them is set out more fully below in analyzing the parties' arguments.

### IV. The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2027.

2. The claimant has not engaged in substantial gainful activity since November 1, 2022, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. The claimant has the following severe impairments: major depressive disorder; bipolar disorder; post-traumatic stress disorder (PTSD); intermittent explosive disorder; degenerative disc disease with sciatica (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: frequent use of ramps and stairs; occasional climbing ladders, ropes, and scaffolds; frequent stooping, crouching, and kneeling; occasional crawling; avoid hazards such as heavy and moving machinery and unprotected heights; can tolerate simple, routine, tasks with occasional interaction with coworkers and supervisors; to the extent any interaction is outside the scope of job duties and job functions, that interaction should be limited to less than occasional; avoid tandem work; avoid interaction with the public; occasional changes and occasional decision making in a static work environment; can tolerate few detailed instructions; avoid positions that require use of supervisory, managerial, conflict resolution, or mediation skills.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

…

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 1, 2022, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(ECF No. 8, PageID #: 77-78, 80, 86-87).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial

8

evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B. Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

### C. Discussion

Echevarria raises two issues on appeal. First, Plaintiff argues that "[d]espite purporting to find an RFC more restrictive than the state agency review opinions, the ALJ ignored various of their limitations and did not incorporate them, without explanation." (ECF No. 10 at 9). Second, Plaintiff argues the ALJ "did not properly evaluate FNP Napierala's opinion for

9

supportability." (*Id.* at 10). Both of these arguments challenge the ALJ's consideration of medical opinions in crafting Plaintiff's RFC.

At step four, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 416.920(e). Under the current regulations, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." 20 C.F.R. § 416.920c(a). Nevertheless, an ALJ must "articulate how [he] considered the medical opinions and prior administrative medical findings" in adjudicating a claim. *Id.* Medical source opinions are evaluated using the factors listed in 20 C.F.R. § 416.920c(c). The factors include: supportability; consistency; the source's relationship with the claimant; the source's specialized area of practice, if any; and "other factors that tend to support or contradict a medical opinion." 20 C.F.R. § 416.920c(c). The ALJ is required to explain how he considered the supportability and consistency of a source's medical opinion, but generally is not required to discuss other factors. 20 C.F.R. § 416.920c(b)(2). Under the regulations, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be" and "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical findings(s) will be." 20 C.F.R. § 416.920c(c)(1)-(2). "If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7.

1.  **Incorporation of State Agency Opinions into the RFC**

Plaintiff first challenges the ALJ's alleged failure to account for all the limitations opined by the State agency reviewing psychologists in the ultimate RFC. (ECF No. 10 at 9).

In evaluating the paragraph B criteria as relevant to the step three listing determination, the State agency consultant at the initial level concluded Plaintiff had moderate limitations in his abilities to interact with others and adapt or manage himself, and mild limitations in his ability to concentrate, persist, or maintain pace. (ECF No. 8, PageID #: 140). As to Plaintiff's RFC, the State agency consultant concluded Plaintiff was moderately limited in his ability to interact appropriately with the general public; to accept instructions and respond appropriately to criticism to supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. (*Id.* at PageID #: 142-43). As additional explanation, the consultant indicated Plaintiff was "able to relate on a superficial basis with coworkers and supervisors" but "should have minimal interaction with the general public," and was "able to work in relatively static environments where job demands are routine and predictable in nature." (*Id.*). These findings were adopted by a different State agency consultant at the reconsideration level. (*Id.* at PageID #: 157, 160-61).

The ALJ provided the following explanation for how he considered these opinions:

> These opinions were somewhat persuasive since the overall evidence supported no more than moderate functional limitations. This was evidence [sic] by typically conservative treatment consisting of medication management that generally provided good results, and mental status exams that were largely within normal limits such as normal attention and concentration, goal directed thought process, cooperative and and/or pleasant behavior, fair to good judgment and insight, and normal memory (3F/8, 23; 4F/2, 19; 5F/3, 30-31, 43; 7F/3, 22). However, due to the claimant's testimony regarding problems interacting with others and the increased stress this can cause, which can exacerbate symptoms (i.e., inpatient treatment for suicidal ideations), the undersigned

11

> provided more restrictive limitations than outlined by the State agency psychologists. For example, he was to avoid tandem work, avoid interaction with the public, avoid positions that require use of supervisory, managerial, conflict resolution, or mediation skills, and for interaction that is outside the scope of job duties and job functions, it should be limited to less than occasional.

(ECF No. 8, PageID #: 84).

Plaintiff argues that "[w]hile the ALJ's RFC arguably accounts for some of [the opined] limitations, it does not account for the limitation to getting along with coworkers or peers without distracting them or exhibiting behavioral extremes." (ECF No. 10 at 9). Plaintiff argues his psychiatric records "clearly support the state agency reviewing psychologists' limitation regarding behavioral extremes and unduly distracting others" such that the ALJ erred in not adopting these limitations, "which would likely manifest in the form of off-task limitations." (*Id.* at 10).

The Commissioner responds that "the ALJ's RFC is more restrictive than the prior administrative medical findings." (ECF No. 12 at 7). Specifically, the Commissioner argues that "[t]his Court has found that a limitation to no tandem work can account for the opinion a claimant is limited to superficial interaction" such that the ALJ adequately accounted for the opined limitations and further limited Plaintiff to only occasional or less interaction with coworkers and supervisors. (*Id.* at 7-8 (citing *Wieman v. Comm'r of Soc. Sec.*, No. 3:22-CV-1045, 2023 WL 5541597, at *3 (N.D. Ohio Aug. 29, 2023))). Further, the Commissioner argues that while Plaintiff points to his "moderate limitations getting along with coworkers or peers without distracting them or exhibiting behavioral extremes," a "moderate limitation indicates a claimant's function on a sustained basis is 'fair'" and "Plaintiff has not explained how the state agency's 'moderate' limitation is inconsistent with the RFC." (*Id.* at 8).

The Court agrees with the Commissioner. As an initial matter, "[e]ven where an ALJ

12

provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015). Here, the ALJ incorporated the opined limitation regarding interacting with the general public by including a provision that Plaintiff "avoid interaction with the public" in the RFC. (ECF No. 8, at PageID #: 80). Similarly, the ALJ accommodated the opinions that Plaintiff would have moderate limitations in his ability to respond to criticism to supervisors and respond appropriately to changes in the work setting by providing that Plaintiff could "tolerate simple, routine, tasks with occasional interaction with coworkers and supervisors" with "few detailed instructions" and "occasional changes and occasional decision making in a static work environment." (*Id.*). Finally, the Court agrees with the Commissioner that the ALJ incorporated the challenged opinion concerning Plaintiff's moderate limitations in getting along with coworkers or peers without distracting them or exhibiting behavioral extremes by not only limiting Plaintiff to occasional interaction with coworkers (or less than occasional when the interaction was "outside the scope of job duties and job functions") but by also including "no tandem work" in the RFC. (*Id.*).

While Plaintiff asserts that an adoption of the "behavioral extremes and unduly distracting others" limitation "would likely manifest in the form of off-task limitations," he fails to cite any records or case law to support his assertion. (ECF No. 10 at 10). Nor does Plaintiff present any argument in response to the Commissioner as to how the ALJ's RFC—specifically the portions highlighted above—does not adequately account for this limitation. (*See* ECF No. 13). The Court concludes the limitations in the RFC adequately account for the opined State agency limitations such that the ALJ did not err by failing to provide any additional explanation.

13

2. **Consideration of Napierala's opinion**

Plaintiff next challenges the ALJ's evaluation of Napierala's opinion, arguing the "ALJ's analysis of supportability was flawed." (ECF No. 10 at 11).

In a Treating Source Statement completed on May 6, 2024, Napierala classified most of Plaintiff's mental abilities as falling into either Category III, meaning his impairments preclude performance from 11% to 20% of an 8-hour workday, or Category IV, meaning his impairments preclude performance for more than 20% of an 8-hour workday. (ECF No. 8, PageID #: 878-79). Napierala indicated Plaintiff's ability to work in coordination with or proximity to others without being unduly distracted precluded all performance in a regular work setting. (*Id.*). Napierala provided the following explanation: "Jose angers easily and this increases under stress. He has a hard time staying on task and completing them on a timely manner. His concentration and focus is greatly affected when he does not sleep. He reports this happens 3 days a week." (*Id.* at PageID #: 879). Napierala further opined that Plaintiff would miss more than four days of work per month due to lack of sleep during manic episodes. (*Id.* at PageID #: 880).

The ALJ summarized Napierala's opinion and her consideration of the opinion:

> A treating source statement was submitted by Angela Napierala, CNP dated May 6, 2024 (9F). The nurse practitioner stated she has treated the claimant since November 28, 2023 with medications and therapy. She explained that the claimant angers easily, medications cause drowsiness, and he has impaired concentration that affects his ability to safely complete job duties and it would put him and others at risk of harm. Because of this, she opined the claimant could not engage in full-time employment. The nurse practitioner also opined that the claimant would be off task more than 20 percent of the time for multiple categories such as remembering simple work instructions, maintaining attention for two-hour segments, and deal with normal stress, and he could not ever work in coordination with or proximity to others without being unduly distracted. She said the claimant would be absent from work more than four days per month due to manic episodes, not sleeping, and that he had moderate limitation in understanding,

14

> remembering, and applying formation an interacting with others, and marked limitation with concentration, persistence, and maintaining pace and adapting and managing self (Id.).
>
> This opinion was not persuasive because it was not consistent with the overall record. For example, while mental status exams by Ms. Napierala found the claimant with depressed and anxious mood during some encounters, she consistently found that his memory, attention, and concentration were within normal limits, judgment and insight were good, and intelligence was estimated as average (5F/3, 20-21, 30-31, 42-44). As described above, mental status exams by other medical providers in the record showed the claimant's mental status exams were largely within normal limits such as normal attention and concentration, goal directed thought process, cooperative and and/or pleasant behavior, fair to good judgment and insight, and normal memory (3F/8, 23; 4F/2, 19; 7F/3, 22). These overall mental status findings are not consistent with her opinion of the claimant's extreme limitations such as he would be easily angered and have significant concentration and focus problems preventing him from working. In addition, Ms. Napierala relied on the claimant's self-reports at times in her opinion. For example, the claimant told her that he has manic episodes three days per week that would prevent him from working; however, frequent manic episodes are not reported in the treatment notes on the claimant. Basing an opinion on the claimant's self-reports instead of objective evidence reduces the persuasiveness of the opinion. Moreover, her treatment notes specifically marked that the claimant had no side effects to medication, which is not consistent with her statement in the document that said medications caused drowsiness which would impair his ability to perform a job (5F/18, 41). Ms. Napierala also failed to report in the document that the claimant used marijuana regularly for which she said in the treatment notes that he had symptoms consistent with a cannabis use disorder (5F/10). Finally, during the short period that Ms. Napierala treated the claimant up to the point where she offered her opinion, the claimant suffered a significant loss when his girlfriend was murdered in January 2024, and this was specifically mentioned as a trigger for increased symptoms during this time in the treatment records (5F/27). This is an important piece of information that the nurse practitioner does not note in the medical source statement that puts in perspective the extreme stress that the claimant was experiencing that exacerbated his symptoms during that period.

(ECF No. 8, PageID #: 84-85).

Plaintiff argues that in analyzing this opinion, the ALJ mischaracterized the record because while the ALJ found Napierala's opinion unsupported because Plaintiff's mental status exams were "largely within normal limits," the record shows "Plaintiff's tendencies to frequently decompensate and end up hospitalized" even before the death of his fiancé. (ECF No. 10 at 11). Additionally, Plaintiff argues that a record of his hospitalization following an altercation with his sister negates the ALJ's conclusion that Plaintiff would not be easily angered. (*Id.* at 11-12). Plaintiff also argues the ALJ erred in citing the fact that Napierala's opinion was based largely on his self-reports because "that is largely the source of information that psychiatric providers use to assess limitations in these cases." (*Id.* at 13). Finally, Plaintiff argues the ALJ improperly discounted the opinion based on Napierala's failure to mention a cannabis disorder and the death of Plaintiff's fiancé because the record did not reflect that "Plaintiff's cannabis disorder had any appreciable effect on his functioning" and his psychiatric issues predated his fiancé's death. (*Id.* at 14).

The Commissioner responds that the ALJ appropriately considered the opinion's persuasiveness and the ALJ's persuasiveness finding is supported by substantial evidence. (ECF No. 12 at 9). The Commissioner asserts Plaintiff's argument that the ALJ failed to consider his tendency to decompensate and end up hospitalized is merely a request that the Court reweigh the evidence in his favor. (*Id.* at 9-10). The Commissioner argues "there was nothing improper about the ALJ considering the fact that Ms. Napierala relied on Plaintiff' subjective complaints as one consideration in evaluating supportability" under the revised regulations. (*Id.* at 10). As to the cannabis use disorder, the Commissioner asserts that "Ms. Napierala diagnosed cannabis abuse, but she did not mention that diagnosis in her opinion" and the ALJ, "as finder of fact, could consider this inaccuracy in assessing the supportability of Ms. Napierala's opinion." (*Id.*

16

at 11). Finally, the Commissioner argues "the fact that Plaintiff's mental status deteriorated while Ms. Napierala was treating him—after a period of stability from February through October—due to situational stressors was relevant to evaluating her opinion." (*Id.*).

The Court again agrees with the Commissioner. The ALJ's explanations makes clear that she considered both the supportability and consistency factors in finding Napierala's opinion unpersuasive.

As to supportability, which looks to the objective evidence and explanations for the opinions, the ALJ found that Napierala's opinions were not supported by her own medical records. First, as indicated by the ALJ, despite her restrictive opined limitations, Napierala documented relatively normal mental status exams during Plaintiff's visits. (ECF No. 8, PageID #: 576 (anxious mood and flat affect but otherwise normal); 593-94 (sad mood and blunted/flat affect but otherwise normal); 603-02 (sad/anxious mood, anxious/blunted affect, and pressured speech but otherwise normal); 615-17 (sad/anxious mood with blunted/flat affect but otherwise normal)). Additionally, the ALJ cited the fact that Napierala's opinion concerning the frequency of Plaintiff's manic episodes and their impact on his ability to work was based entirely on Plaintiff's self reports, rather than any corroborating objective medical evidence. (*Id.* at PageID #: 85). The ALJ also properly found that Napierala's opinion was not supported by her records because, contrary to her indication in the opinion that Plaintiff suffered side effects from medication, Napierala's records documented denial of side effects. (*Id.* at PageID #: 591, 614).

Turning to consistency, which looks to other medical sources, the ALJ found that Napierala's opinion was inconsistent with generally normal mental status exams throughout the record. (*Id.* at PageID #: 85). The records cited by the ALJ amount to substantial evidence supporting this conclusion. (*See id.* at PageID #: 420, 435, 541, 558, 833, 852).

17

Overall, the Court concludes that the ALJ appropriately considered the supportability and consistency factors in assessing Napierala's opinion and substantial evidence supports that conclusion.  At best, Plaintiff is asking the Court to reweigh the evidence and reach a different outcome, which is beyond the scope of this Court's review.  Rather, "as long as the ALJ's findings were, as here, supported by substantial evidence, [a court] may not second-guess them, even if substantial evidence would support the opposite conclusion." *Napier v. Comm'r of Soc. Sec.*, 127 F.4th 1000, 1007 (6th Cir. 2025).

## VI. Conclusion

Based on the foregoing, the Court AFFIRMS the Commissioner of the Social Security Administration's final decision denying Echevarria benefits.

Dated: December 3, 2025

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE